# EXHIBIT A

# NOTICE OF REMOVAL

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
EMERGENCY MEDICINE SPECIALISTS OF ORANGE COUNTY,

| FOR COURT USE ONLY |
| --- |
| *(SOLO PARA USO DE LA CORTE)* |

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Orange County Superior Court
Central Justice Center
700 Civic Center Drive West
Santa Ana, CA 92701

| CASE NUMBER: |
| --- |
| *(Número del Caso):* 30-2025-01476588-CU-BC-CJC |

Assigned for All Purposes

Judge Shawn Nelson

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Andrew H. Selesnick (SBN: 160516) Philip A. Scarborough (SBN: 254934) (213) 891-0070
BUCHALTER, APC
1000 Wilshire Blvd., #1500, Los Angeles, CA 90017

DATE: 04/18/2025    DAVID H. YAMASAKI, Clerk of the Court    Clerk, by *J. Esquivel*    J. Esquivel    , Deputy
*(Fecha)*    *(Secretario)*    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☑ on behalf of *(specify):* CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC

   under: ☑ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☑ by personal delivery on *(date):* 5/6/2025

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]
**SUMMONS**
Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

Electronically Filed by Superior Court of California, County of Orange, 04/18/2025 01:04:11 PM.
30-2025-01476588-CU-BC-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Jo Esquivel, Deputy Clerk.
#:10

BUCHALTER
A Professional Corporation
ANDREW H. SELESNICK (SBN: 160516)
PHILIP A. SCARBOROUGH (SBN: 254934)
1000 Wilshire Blvd, #1500
Los Angeles, CA 90017
Telephone: 213.891.0700
Fax: 213.896.0400
Email: aselesnick@buchalter.com
Email: pscarborough@buchalter.com

Attorneys for Plaintiff
EMERGENCY MEDICINE SPECIALISTS OF ORANGE COUNTY

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

Assigned for All Purposes
Judge Shawn Nelson

| EMERGENCY MEDICINE SPECIALISTS OF ORANGE COUNTY, | CASE NO. 30-2025-01476588-CU-BC-CJC |
|---|---|
| Plaintiff, | **COMPLAINT FOR** |
| vs. | **1. BREACH OF CONTRACT**<br>**2. FRAUD** |
| CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, | **3. NEGLIGENT MISREPRESENTATION**<br>**4. FRAUDULENT CONCEALMENT** |
| Defendant. | **5. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING** |
| | DEMAND FOR JURY TRIAL |

Plaintiff EMERGENCY MEDICINE SPECIALISTS OF ORANGE COUNTY ("Plaintiff" or "EMSOC") alleges against Defendant CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC ("Defendant" or "Change") and Does 1 through 50, inclusive, as follows:

## NATURE OF ACTION

1.     This action involves Change's fraudulent, wrongful, and unlawful refusal to provide reasonable transitional services to EMSOC when EMSOC ended its medical billing relationship with Change pursuant to the terms of the parties' contract. Specifically, Change failed to turn over imperative medical billing data required for EMSOC to collect on its accounts receivable inventory,

1 once EMSOC sought to transition to a new medical billing provider. Indeed, Change either ignored
2 or stonewalled EMSOC when the latter's representatives made numerous requests to obtain its
3 accounts receivable data over several months *after* terminating its relationship with Change.
4 Change thereafter made knowing misrepresentations and/or omissions of material facts, misleading
5 EMSOC to believe that Change could not provide the requested data until it was able to recover
6 access to its systems after a cybersecurity attack. Change's representations proved false. In reality,
7 Change's systems had been "back online" for months while Change withheld EMSOC's accounts
8 receivable data. Change did not turn over the data until seven (7) months after EMSOC had
9 terminated the parties' relationship.

10     2.     EMSOC's intentional and excessive delay caused thousands of EMSOC's accounts
11 receivable to go "stale", substantially reducing both the number of accounts EMSOC could collect
12 on and the amounts EMSOC could collect. EMSOC was further forced to incur additional fees and
13 expense to carry out the collection process, driving up its operational costs. As a result of Change's
14 misconduct, EMSOC has suffered damages in excess of the jurisdictional minimum.

15 **THE PARTIES**

16     3.     Plaintiff Emergency Medicine Specialists of Orange County is a general partnership
17 organized under the laws of the State of California. EMSOC has its primary place of business in
18 Orange, California.

19     4.     Defendant Change Healthcare Technology Enabled Services, LLC is a limited
20 liability company organized and existing under the laws of the State of Georgia. Plaintiff is
21 informed and believes, and thereon alleges, that Change's principal place of business is located at
22 1 Optum Circle, Eden Prairie, MN 55344.

23     5.     The true names and capacities of the defendants named here as Does 1 through 50
24 – whether individual, corporate, associate, or otherwise – are unknown to Plaintiff. Therefore,
25 Plaintiff alleges that each of these fictitiously named defendants is in some manner responsible for
26 the conduct and events set forth in this action. Plaintiff will seek leave of court to amend the
27 complaint to assert the true names and capacities of these Doe defendants when their identities and
28 capacities have been ascertained.

## JURISDICTION AND VENUE

6.     Plaintiff is informed and believes, and thereon alleges, that the events giving rise to the causes of action set forth herein occurred in the County of Orange and State of California within this judicial district, and that each defendant engages in substantial business in the County of Orange and State of California within this judicial district; and the damages arising out of the causes of action alleged herein exceed the jurisdictional limits of any court such that this action is brought before this Court in the proper forum and venue.

## GENERAL ALLEGATIONS

7.     EMSOC is an emergency medicine physicians group that provides emergency medical services to emergency department patients at St. Joseph Hospital and Children's Hospital of Orange County, located in Orange, California.

8.     Change is in the business of providing healthcare information technical services, such as medical billing, to healthcare groups like EMSOC.

9.     On or about April 4, 2012, EMSOC entered into a Reimbursement Management Services Agreement ("RMSA") with PST Services, Inc. ("PST Services"). A true and correct copy of the RMSA is attached hereto as **Exhibit A**.

10.     The RMSA required PST Services to provide billing services for EMSOC, as further specified in that contract, including but not limited to coding medical claims, managing accounts receivable, providing monthly account management reports, and submitting medical claims to health insurers and other payors for reimbursement. Section 12.1 and 12.2 of the RMSA required PST Services to perform reasonable transitional services upon termination of the RMSA, including providing accounts receivable data to EMSOC or its designee. *See* Ex. A, §§ 12.1, 12.2.

11.     Plaintiff is informed and believes, and thereon alleges, that PST Services was acquired by, merged into, or otherwise became Change Healthcare Technology Enabled Services, LLC at an unknown date.

12.     On or about July 13, 2020, EMSOC executed an Amendment to the RMSA. A true and correct copy of the Amendment to the RMSA is attached hereto as **Exhibit B**. The Amendment

1  to the RMSA specified that Change assumed all rights and responsibilities of PST Services under
2  the RMSA.

3      13.    On or about December 31, 2023, EMSOC notified Change that it was terminating
4  the RMSA and would be using a different billing company beginning 120 days later.  Pursuant to
5  Sections 12.1 and 12.2 of the RSMA, EMSOC expected Change to provide reasonable services to
6  assist EMSOC in transitioning its billing operations to the new billing company, including without
7  limitation providing data about EMSOC's accounts receivable. *See* Ex. A, §§ 12.1, 12.2.

8      14.    Plaintiff is informed and believes, and thereon alleges, that in or around February
9  2024, Change faced a cybersecurity attack due to Change's own negligence, which disrupted
10  Change's processing of certain medical claims.

11     15.    Change and EMSOC thereafter agreed to the following terms regarding the
12  termination of Change's services as EMSOC's medical billing provider.

13         (a)    Change and EMSOC agreed that EMSOC's new billing company would
14  begin providing billing services for EMSOC on April 1, 2024.

15         (b)    EMSOC's new billing company would be responsible for processing and
16  billing claims with an effective date of March 1, 2024, and processing and coding claims with dates
17  of service between February 14, 2024 and February 29, 2024. Additionally, the new billing
18  company would handle collecting on accounts receivable with dates of service on or before
19  February 13, 2024.

20     16.    During this time, Change represented to EMSOC that it was working to restore its
21  servers and applications, which in Change's own words would take weeks but not months.  As of
22  April 1, 2024, however, EMSOC still had not received critical accounts receivable data from
23  Change to enable EMSOC's new billing company to collect on EMSOC's accounts receivable
24  inventory.

25     17.    Beginning in May 2024, EMSOC's leadership made numerous, nearly weekly
26  requests to Change to provide EMSOC's accounts receivable data.  Specifically, EMSOC's Chief
27  Operating Officer Chris Zepeda sent numerous emails to, and had several phone calls with, John
28  Mullin, who was the Vice President of Ambulatory Client Management, RCM Services at Optum

Insight, an affiliate of Change that was responsible for Change's interactions with EMSOC. Mr. Mullin repeatedly failed to respond to EMSOC's communications requesting its accounts receivable data.

18.     On July 8, 2024, Mr. Mullin sent an email to Mr. Zepeda stating that Change would generate the accounts receivable file for EMSOC when Change's "system is back online" in the wake of the February 2024 cybersecurity attack. Mr. Mullin's representations led EMSOC to reasonably believe that Change could not provide EMSOC's accounts receivable data because Change did not have access to its system but that Change would immediately rectify the problem once its system was "back online". However, this was false.

19.     Plaintiff is informed and believes, and thereon alleges, that Change's system came back online in or about August 2024, if not earlier.

20.     Despite EMSOC's many attempts to follow-up, Change refused to provide any substantive updates regarding the transfer of EMSOC's accounts receivable data and intentionally concealed the fact that Change was already "back online" and servicing other active clients' accounts. Thus, Change had the ability to transfer EMSOC's accounts receivable data in or before August 2024 but purposefully withheld EMSOC's data to work on other accounts until October 22, 2024, so that EMSOC could not move on after separating from Change. By the time EMSOC did receive its data, seven months had passed since Change had stopped rendering billing services to EMSOC.

21.     Health care payors have strict deadlines for the submission of claims. As a medical billing provider, and specifically EMSOC's medical billing provider, Change knew that each day it delayed in providing EMSOC's accounts receivable data directly impacted EMSOC by reducing its ability to collect on accounts.

22.     Once EMSOC received and accessed its accounts receivable data after October 22, 2024, EMSOC discovered that a dramatic number of claims had expired on gone stale. Due to untimeliness, EMSOC either could not collect on those expired claims at all or could only recover drastically lesser amounts. In addition, EMSOC was forced to pay higher fees to its new billing provider to process and submit these stale claims.

23.     EMSOC further discovered that Change failed to code claims with dates of service prior to February 14, 2024, and timely submit these claims for reimbursement pursuant to its agreement with EMSOC.

24.     Change's unlawful conduct has caused EMSOC damage in an amount in excess of the Court's jurisdictional minimum. EMSOC has also incurred additional and substantial costs in the collection process as a result of Change's failure to provide reasonable transition services.

## FIRST CAUSE OF ACTION

### Breach of Contract

### (Against All Defendants)

25.     EMSOC incorporates by reference every allegation in Paragraphs 1 through 24 inclusive.

26.     EMSOC and Change entered into a medical services billing contract which required Change to, among other things, provide medical coding of claims, manage accounts receivable, and submit medical claims to health insurers and other payors for reimbursement. Change was also required to provide reasonable transitional services and transfer accounts receivable data upon termination of the parties' relationship. *See* Ex. A, §§ 12.1, 12.2.

27.     EMSOC fulfilled all of its obligations under its contract with Change, except those excused, including making all payments to Change due and owed under the contract.

28.     Change breached the contract when it failed to provide reasonable transitional services and timely transfer EMSOC's accounts receivable data to EMSOC and its new medical billing provider until October 22, 2024.

29.     Change further breached its obligation to provide billing services for claims with dates of service prior to February 14, 2024. Specifically, Change failed to code claims during this time period and submit them for reimbursement in a timely way as it was obligated to do under its agreement with EMSOC.

30.     As a proximate result of Change's breaches, EMSOC has sustained damages in excess of the jurisdictional limits of this Court, the exact amount to be proved at trial.

/ / /

## SECOND CAUSE OF ACTION

### FRAUD

(Against All Defendants)

31.     EMSOC incorporates by reference the allegations set forth in Paragraphs 1 through 30 inclusive.

32.     Plaintiff is informed and believes, and thereon alleges, that RCM Services at Optum Insight is an agent, affiliate, and/or representative of Change, that they both are owned by United Healthcare, and that John Mullin, VP Ambulatory Client Management of RCM Services at Optum Insight is an agent, affiliate, and/or representative of Change.

33.     Change, by and through Mullin, intentionally and/or recklessly made material misstatements and omissions of material fact to EMSOC specifically that Change would "…generate the AR file for . . . [EMSOC's new billing company] when the system is back online."

34.     Upon information and belief, Change's systems came back online in August 2024. But, Change did not turn over EMSOC's accounts receivable data in August 2024 or respond to EMSOC's communications regarding the status of the transfer.  Change withheld the accounts receivable data from EMSOC until October 22, 2024, prioritizing other accounts.

35.     Change's statements were false, and Change knew them to be false at the time they were made.

36.     Change's statements were intended to induce EMSOC to perform its obligations under the parties' contract and to refrain from taking further action regarding its accounts receivable data.  Further, Change's statements were intended to mislead EMSOC into believing that Change would transfer the accounts receivable data but for issues caused by the cybersecurity attack, which was not true.

37.     EMSOC justifiably relied on Changes' statements as alleged herein.

38.     Had EMSOC known Change did not intend to transfer the accounts receivable data when Change's system came back online, EMSOC would have taken further action against Change at the time.  Said differently, EMSOC would not have continued to work with Change to find a resolution had EMSOC been aware of the truth.

39.    EMSOC further alleges that Change's aforementioned conduct was intended to cause injury to EMSOC or was despicable conduct carried on by Change with a willful and conscious disregard of the rights of the EMSOC or subjected EMSOC to unjust hardship in conscious disregard of EMSOC rights or was an intentional misrepresentation, deceit or concealment of material facts known to Change with the intent to deprive EMSOC of property, legal rights, or to otherwise cause injury, such as to constitute malice, oppression, or fraud under California *Civil Code* § 3294, thereby entitling EMSOC to punitive damages in an amount determined by the court.

40.    Change's conduct was highly reprehensible because, among other things:  (A) it caused substantial economic loss to EMSOC; (B) it demonstrated Change's indifference as to the rights of EMSOC; (C) it was continuous, lasting months after the parties had terminated their working relationship; (D) it caused harm to EMSOC not by accident, but rather by Change's intentional malice, trickery and deceit; and (E) EMSOC was financially vulnerable to Change's misconduct.

41.    As a proximate cause of Changes' fraudulent conduct, EMSOC has sustained damages in excess of the jurisdictional limits of this Court, the exact amount to be proved at trial.

## THIRD CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

(Against All Defendants)

42.    EMSOC incorporates by reference the allegations set forth above in paragraphs 1 through 41 inclusive.

43.    The representations of facts, and the failure to disclose facts, and the suppression and concealment of facts, by Change, as alleged herein, were done by and through, among other persons, John Mullin as Change's agent.  Specifically, on July 8, 2024, John Mullin, as the agent, affiliate, or representative of Change, advised EMSOC that Change would "generate the AR file for . . . [EMSOC's new billing company] when the system is back online." The representations of fact made by Change were false and made without reasonable grounds for believing the representations to be true.

44.     At the time these representations were by made by Change to EMSOC, EMSOC was ignorant and unsuspecting of the falsity of Change's representations and believed them to be true.  In reliance upon these representations, EMSOC performed its obligations under the parties' contract and refrained from taking action against Change to recover EMSOC's accounts receivable data.  To the extent that Change believed its representations to be true, then Change is liable for its negligent misrepresentations.

45.     Upon information and belief, Change's systems came back on line in August 2024, if not before.  But, Change did not turn over EMSOC's accounts receivable data in August 2024 or respond to EMSOC's communications regarding the status of the transfer.  Change withheld the accounts receivable data from EMSOC until October 22, 2024.

46.     Had EMSOC been provided with accurate and complete information by Change, it would not have refrained from taking action against Change at the time.

47.     As a proximate result of Change's tortious conduct, EMSOC has sustained damages in excess of the jurisdictional limits of this Court, the exact amount to be proved at trial.

### FOURTH CAUSE OF ACTION

### (FRAUDULENT CONCEALMENT)

(Against All Defendants)

48.     EMSOC incorporates by reference the allegations set forth above in paragraphs 1 through 47 inclusive.

49.     Change had a duty to disclose facts regarding the turnover to EMSOC of its accounts receivable data, including when Change's systems came back online and Change had the ability to transfer the data to EMSOC, in or about August 2024.

50.     Between August 2024 and October 22, 2024, Change actively concealed material facts from EMSOC including that its systems were back online which would have enabled Change to transfer EMSOC's accounts receivable data.

51.     As a result of Change's concealment, EMSOC did not discover that Change had the ability to turn over EMSOC's data months before it actually did.

52.     As a proximate result of Change's tortious conduct, EMSOC has sustained damages in excess of the jurisdictional limits of this Court, the exact amount to be proved at trial.

53.     EMSOC is informed and believes, and on that basis alleges, that Change's conduct was fraudulent, willful, malicious and oppressive, and constitutes despicable conduct and a conscious disregard of EMSOC's rights, and was intended to cause harm to EMSOC because it had terminated the parties' working relationship. EMSOC is therefore entitled to recover punitive damages.

## FIFTH CAUSE OF ACTION

### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

#### (Against All Defendants)

54.     EMSOC incorporates by reference the allegations set forth above in paragraphs 1 through 53 inclusive.

55.     Change, at all times relevant hereto, had a duty to act fairly and in good faith towards EMSOC in fulfilling Change's duties and obligations under the terms of the RMSA.

56.     Implied in the RMSA are, among other things, the duties of Change, to act fairly and in good faith by, among other things, providing EMSOC with its accounts receivable data once EMSOC advised Change that it desired to terminate the parties' working relationship.

57.     Change, at a minimum, has breached its duty of good faith and fair dealing owed to EMSOC in the following respects:

(a)     Failing to respond to or otherwise stonewalling EMSOC's numerous, nearly weekly requests to Change to provide EMSOC's accounts receivable data;

(b)     Promising Change would "generate the AR file for . . . [EMSOC's new billing company] when the system is back online[,]" without any intention of doing so;

(c)     Failing to provide EMSOC its accounts receivable data when Change's systems was back online in or about August 2024;

(d)     Withholding EMSOC's data until October 22, 2024, seven months after the parties' relationship had terminated.

58.    As a proximate result of Change's aforementioned bad faith breach of the RSMA, EMSOC has sustained damages in excess of the jurisdictional limits of this Court, the exact amount to be proved at trial, but reasonably believed to exceed $3.7 million.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against the Defendants, and each of them, as follows:

1.    For monetary damages in an amount to be proven at trial;

2.    For punitive damages and exemplary damages on the second and fourth causes of action, as allowed by law;

3.    For pre-judgment and post-judgment interest as allowed by law;

4.    For attorneys' fees as allowed by law;

5.    For such other or further relief as the Court may deem just or proper.

**DATED:  April 18, 2025**

BUCHALTER

**A Professional Corporation**

By: _____

ANDREW H. SELESNICK
PHILIP A. SCARBOROUGH

Attorneys for Plaintiff
EMERGENCY MEDICINE SPECIALISTS OF
ORANGE COUNTY

Exhibit "A"

**CONFIDENTIAL AND PROPRIETARY**    Client Name:    Emergency Medicine Specialists of Orange County
                                    Contract Number:    RMS136419

### REIMBURSEMENT MANAGEMENT SERVICES AGREEMENT

THIS REIMBURSEMENT MANAGEMENT SERVICES AGREEMENT ("Agreement") is made and entered into by and between PST Services, Inc. (a McKesson company), a Georgia corporation ("Per-Se") and Emergency Medicine Specialists of Orange County, a general partnership organized under the laws of the State of California ("Client"), as of April 4, 2012 (the "Effective Date").

NOW, THEREFORE, in consideration of the covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Client and Per-Se agree as follows:

1.    **Services.** Beginning on or about the Commencement Date (as defined below), Per-Se will begin to perform the reimbursement management services set forth on Schedule 1 to this Agreement (the "Services") on behalf of Client for Client's charges with dates of service beginning on the Commencement Date. Client shall, on a timely basis and in a format reasonably acceptable to Per-Se (subject to Per Se delivering such requirements in advance and in writing to Client), provide the information set forth on Schedule 1 requested by Per-Se to perform such Services in an accurate, efficient and timely manner (the "Client Responsibilities"). During the term of this Agreement, with respect to Client's provision of professional services, Per-Se will be the sole provider to Client of all of the Services identified as "Reimbursement Management Services" on Schedule 1 to this Agreement, but only with respect to the Client's professional services that accrue on or after the Commencement Date. In performing the Services hereunder, Client acknowledges that Per-Se shall at all times be acting as an independent contractor.

2.    **Term.** The initial term of this Agreement will be two (2) years (the "Initial Term") beginning August 1, 2012 (the "Commencement Date"). This Agreement will automatically renew for additional one (1) year terms unless (i) either party delivers to the other written notice of termination at least ninety (90) days prior to the expiration of the then-current term, or (ii) as otherwise set forth in Section 11 of this Agreement.

3.    **Fees.** Beginning as of the Commencement Date, Client agrees to pay Per-Se the fees set forth on Schedule 2 to this Agreement at the times set forth in Schedule 2 (the "Fees").

4.    **Lockbox.** An electronic lockbox will be maintained in the name of Client at a bank designated by Client. All cash receipts will be deposited into the lockbox. Per-Se will have no ownership rights in the lockbox and will have no right to negotiate or assert ownership of checks made payable to Client or make withdraws or transfers thereto or therefrom. Client will be responsible for all fees associated with such lockbox account. Client retains the rights to move or transfer the account to another banking institution of its choice.

5.    **Confidentiality.** Per-Se agrees not to disclose, and to cause its employees, agents and representatives not to disclose, to anyone other than Client the terms of this Agreement, Client's business practices, patient or client lists or other trade secrets or confidential information of Client or any information about any of Client's patients received in the course of performing the Services, except as required to bill charges or as otherwise legally required. Notwithstanding the foregoing, Client agrees that Per-Se may use Client information and data from transactions received or created by Per-Se for data aggregation and/or statistical compilations or reports, research and for other purposes (the "Uses") so long as such Uses are in compliance with all applicable laws and all Client and patient identifying information is de-identified consistent with the HIPAA Privacy Rule and such Uses shall be the sole and exclusive property of Per-Se. Client acknowledges that the software employed by Per-Se in performing the Services (the "Billing System") is confidential and that Per-Se is the sole owner or licensee of the Billing System, all report formats and all reports generated by the Billing System that are produced for internal operational purposes and not generally made available to Client. Client agrees not to disclose and to cause its employees, agents and representatives not to disclose to anyone the terms of this Agreement, the Billing System, or any information it receives about the Billing System, Per-Se's business practices or other trade secrets or confidential information of Per-Se, except as legally required. Per Se represents and warrants that the Billing System is owned or licensed by Per-Se and Per-Se has a license to use any software that it does not own for the uses set for the herein, and such licenses will permit Per-Se's use in connection with this Agreement and for the term of this Agreement. Per-Se will defend any suit instituted against Client and will indemnify and hold harmless Client against any award of damages made against and reasonable costs incurred by Client in a final judgment by a court of competent jurisdiction, or any amount in settlement or compromise thereof, provided that (i) the same is based upon a claim that the Billing System infringes the proprietary rights of a third party under the laws of the United States; (ii) Client gives Per-Se prompt, detailed notice in writing of any such claims asserted; (iii) Client permits Per-Se sole authority through its counsel to defend and/or settle the matter, provided, however, that Per-Se shall not effect any settlement that could result in any cost expense, or liability to Client unless Client consents in writing thereto, which consent shall not be unreasonably withheld, delayed or conditioned; and (iv) Client cooperates and assists with such defense and/or settlement. Client may, at its own cost, participate in such investigation, trial and defense of such lawsuit or action and any appeal arising therefrom. Each party shall safeguard the confidentiality of the other party's confidential information or confidential data using the same standard of care which it uses for its similar confidential materials, but in no event less than reasonable care. Each party agrees that the other party does not have an adequate

**CONFIDENTIAL AND PROPRIETARY**      Client Name:    Emergency Medicine Specialists of Orange County
                                      Contract Number:   RMS136419

remedy at law to protect its rights under this Section and agrees that the non-defaulting party will have the right to seek injunctive relief from any violation or threatened violation of this Section. Notwithstanding the foregoing, Client may share its data and any data or reports it receives from Per-Se that relate to Client with anyone that the Client wishes.

6.      **Exclusion From Federal Healthcare Programs.** Each party warrants that it is not currently listed by a Federal agency as excluded, debarred, or otherwise ineligible for participation in any Federal health care program. Each party agrees that it will not employ, contract with, or otherwise use the services of any individual whom it knows or should have known, after reasonable inquiry, (a) has been convicted of a criminal offense related to health care (unless the individual has been reinstated to participation in Medicare and all other Federal health care programs after being excluded because of the conviction), or (b) is currently listed by a Federal agency as excluded, debarred, or otherwise ineligible for participation in any Federal health care program and further agrees that it will immediately notify the other in the event that it, or any person in its employ, has been excluded, debarred, or has otherwise become ineligible for participation in any Federal health care program. Each party agrees to continue to make reasonable inquiry regarding the status of its employees and independent contractors on a regular basis by reviewing the General Services Administration's List of Parties Excluded from Federal Programs and the HHS/OIG List of Excluded Individuals/Entities.

7.      **Compliance.**

7.1       Per-Se agrees to maintain a billing regulatory compliance program similar to the Office of Inspector General's Compliance Guidance for Third-Party Medical Billing Companies.

7.2       Per-Se agrees that it will comply with applicable laws, rules and regulations related to the Services.

7.3       Per-Se and Client agree to abide by the terms and conditions of the "Business Associate Agreement" attached hereto as Schedule 4.

7.4       Client represents and warrants that it will forward to Per-Se under this Agreement only charges for which Client believes in good faith it is entitled to bill. Client agrees to monitor and to refrain from knowingly submitting false or inaccurate information, charges, documentation or records to Per-Se and to use best efforts to ensure that the documentation provided by Client or an agent of Client to Per-Se has a basis to support the medical services provided by Client. Client acknowledges and agrees it has an obligation to report and correct any credible evidence of deficiencies on the part of Client. Client also acknowledges that Per-Se does not make a determination of medical necessity for any claims.

7.5       Client acknowledges and agrees that Per-Se is not a collection agency. Client represents and warrants that any debt or account referred to Per-Se pursuant to this Agreement is not in default or delinquent or has not been written off as bad debt. If any accounts are found to be written off, in default or otherwise delinquent, Client agrees to immediately recall those accounts from Per-Se's responsibility under this Agreement.

8.      **Operating Procedures.** Client will be responsible for all matters related to Client's practice prior to the Commencement Date, including, but not limited to, Client's billings, collections, third party reimbursements, accounts receivable and credit balances. Client agrees to use its reasonable best efforts to provide or cause others to similarly provide to Per-Se accurate and complete insurance and demographic information as requested by Per-Se to perform the Services. Client acknowledges and agrees that, if it fails to provide Per-Se such information and Per-Se is unable to provide the Services, to the extent that Per-Se's inability to provide the Services is due to Client's failure to provide the information, Per-Se has no responsibility for providing Services to such accounts and no liability to Client resulting therefrom. In the event that Per-Se assigns the procedure and diagnostic codes, Client agrees to provide the necessary clinical information required by Per-Se to perform such coding as described on Schedule 1. In the event that Client is assigning the procedure and diagnostic codes, Client shall be responsible for the accuracy, legality and appropriateness of such codes. Per-Se agrees to perform the Services in accordance with industry practices in Client's specialty and geographic area and all material applicable laws, rules and regulations, including applicable third-party payer policies and procedures. Client acknowledges (i) that certain Services or obligations of Per-Se hereunder may be dependant on Client providing access to certain data, information, or assistance to Per-Se from time to time (collectively, "Cooperation"); and (ii) that such Cooperation may be essential to the performance of services by Per-Se. The parties agree that any delay or failure by Per-Se to provide Services hereunder which is caused by Client's failure to provide timely Cooperation reasonably requested by Per-Se shall not be deemed to be a breach of Per-Se's performance obligations under this Agreement. Client acknowledges that Per-Se has every incentive to perform the Services in a timely and proficient manner but that the timing and amount of collections generated by the Services are subject to numerous variables beyond the control of Per-Se, including, without limitation, (a) the inability of third parties or systems beyond the control of Per-Se to accurately process data, (b) the transmission to Per-Se of inaccurate, incomplete or duplicate data, (c) untimely reimbursements or payer bankruptcies, (d) late charge documentation submissions by Client, and/or (e) managed care contract disputes between payers and Client. Therefore, Per-Se makes no and specifically disclaims any warranties or representations pertaining to the timing and amount of collections generated by the Services. Client acknowledges and agrees that Client is solely responsible for unresolved credit balances, including refunding any overpayments and processing any unclaimed property

**CONFIDENTIAL AND PROPRIETARY**

Client Name:    Emergency Medicine Specialists of Orange County
Contract Number:    RMS136419

payments. Per-Se will provide Client with written notice in the monthly reports and in an annual report provided in a reasonable time after the end of Per-Se's fiscal year, of unresolved credit balances, including, for example, overpayments and unclaimed property of which it becomes aware. Client agrees to indemnify and hold Per-Se harmless from and against any losses (including fines or penalties and interest) incurred by Per-Se as a result of Client's failure to make such refunds and/or payments.

9.    **Audits.**

9.1    During the term of this Agreement, Client will have the right to use internal members of Client ("Internal Auditors") for the purpose of performing audits that may be considered necessary by Client to determine the accuracy and correctness of the accounting and internal control performed and maintained by Per-Se. Per-Se will cooperate by furnishing such Internal Auditors with any and all information as is reasonably necessary to perform and complete all audit procedures determined to be necessary by such Internal Auditors. Client agrees that any such audit will be conducted at such times and in such a manner so as to avoid undue disruption of Per-Se's operations.

9.2    During the term of this Agreement, Client will have the right to engage, at its expense, independent, external, third-party auditors (the "Third-Party Auditors") for the purpose of performing audits that may be considered necessary by Client to determine the accuracy and correctness of the accounting and internal control performed and maintained by Per-Se. If Client engages Third-Party Auditors, who perform, or are associated with a group who performs, billing and accounts receivable management services substantially similar to any of the Services identified as "Reimbursement Management Services" on Schedule 1 to this Agreement, such Third-Party Auditors may not visit Per-Se's processing facility or audit the actual billing and collection process. Per-Se will cooperate by furnishing such Third-Party Auditors with information as is reasonably necessary to perform and complete all audit procedures. Prior to performing such audits, Client will cause the Third-Party Auditors to execute Per-Se's "Confidentiality" Agreement, substantially in the form attached hereto as Exhibit A. Client agrees that any such audit will be conducted at such times and in such a manner so as to avoid undue disruption of Per-Se's operations.

10.    **Non-Employment.** During the term of this Agreement and for a period of twelve (12) months following the termination of this Agreement, each party agrees not to employ, contract with for services, solicit for employment on its own behalf or on behalf of any third party, or have ownership in any entity which employs or solicits for employment, any individual who (i) was an employee of the other or its parent, affiliates or subsidiaries at any time during the preceding twelve (12) months and (ii) was materially involved in the provision or receipt of the Services hereunder without the prior written consent of the other party. Notwithstanding the foregoing, upon any termination of this Agreement, Client may rehire any individual who was employed by Client on the Effective Date, and who was hired by Per-Se on or after such date. Each party agrees that the other party does not have an adequate remedy at law to protect its rights under this Section and agrees that the non-defaulting party will have the right to injunctive relief from any violation or threatened violation of this Section. General advertisements or solicitations for hire in any media, including the internet, for non-management personnel by either party shall not be considered a violation of this Agreement.

11.    **Termination.** Notwithstanding the provisions of Section 2:

11.1    Either party may terminate this Agreement on thirty (30) days' prior written notice of termination to the other if the other party defaults on any of its obligations under this Agreement (other than Client's payment obligations) and such party has not begun to cure such default within fifteen (15) days, and materially cured such default within forty-five (45) days, after written notice of such default is delivered; or

11.2    To the extent permitted by applicable law, either party may terminate this Agreement on thirty (30) days' prior written notice of termination to the other if (a) a court having appropriate jurisdiction enters a decree or order for relief in respect of the other party in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or (b) the other party commences a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or

11.3    Per-Se may terminate this Agreement immediately if Client defaults on its payment obligations under Section 3 and Schedule 2 and such payment default is not cured within ten (10) days after Per-Se delivers written notice of such default to Client; or

11.4    If Per-Se contracts for the use of third-party software to be used in the provision of the Services, Client agrees to execute any additional nondisclosure or proprietary material documentation that may be reasonably required by Per-Se or any such third-party software licensor. If Client is unwilling to sign such additional documentation, Per-Se may terminate this Agreement on the ninetieth (90th) business day after presenting such documentation if Client fails to complete such documentation during such time; or

**CONFIDENTIAL AND PROPRIETARY**

Client Name:   Emergency Medicine Specialists of Orange County
Contract Number:   RMS136419

11.5     Client may terminate this Agreement immediately if Per-Se fails to cure any material breach of the "Business Associate Agreement" set forth on Schedule 4 to this Agreement within thirty (30) days of written notice from Client specifying the breach; or

11.6     After the Initial Term, either party may terminate this Agreement at any time and for any reason or no reason on one hundred twenty (120) days' prior written notice to the other party.

12.     **Termination Procedures.**  In the event this Agreement is terminated or expires, Client shall indicate by written notice no later than ten (10) business days prior to the expiration or termination of the Agreement its choice of either the option set forth in Section 12.1 or the option set forth in Section 12.2 as a means of transferring its accounts receivable from Per-Se to another provider of billing services (except as otherwise set forth in Section 12.3 below, in which case only the procedures set forth in Section 12.2 will apply).

12.1     Upon the effective date of termination/expiration, (I) Per-Se shall cease to enter new patient and charge data into the Billing System on behalf of Client, but will (i) continue to perform the Services identified as "Reimbursement Management Services" on Schedule 1 to this Agreement, at the then-current rates hereunder, for a period of ninety (90) days with respect to all of Client's accounts receivable arising from charges rendered prior to the termination date (the "Workout Period"), (ii) thereafter discontinue processing such accounts receivable, (iii) after full payment of all fees owed, (1) deliver to Client a final list of accounts receivable and (2) provide reasonable transitional services, as set forth on Schedule 3 to this Agreement, and (II) each party will have no further obligations to the other party.  The parties agree that all applicable terms and conditions of this Agreement will be in full force and effect until the end of the Workout Period; or

12.2     (a)     For Client's accounts receivable for which Per-Se receives a Fee based on a percentage of the Net Collections, on or before the effective date of termination/expiration, Client shall pay Per-Se a one-time fee for the Services provided by Per-Se during the immediately preceding months equal to the amount listed on Schedule 2 to this Agreement (the "Services Rendered Fee").  Upon the effective date of termination/expiration, (I) Per-Se shall (i) be immediately relieved of the obligation to provide any further Services on behalf of Client, (ii) after full payment of all fees owed, including but not limited to the Services Rendered Fee, (1) deliver to Client a final list of accounts receivable and (2) provide reasonable transitional services, as set forth on Schedule 3 to this Agreement, and (II) each party will have no further obligations to the other party.  The Services Rendered Fee is in no way intended to limit the rights and remedies Per-Se may have against Client arising out of any breach of this Agreement; and/or

(b)     For Client's accounts receivable for which Per-Se receives a Fee based on a set dollar amount, upon the effective date of termination/expiration, (I) Per-Se shall (i) be immediately relieved of the obligation to provide any further Services on behalf of Client, (ii) after full payment of all fees owed, (1) deliver to Client a final list of accounts receivable and (2) provide reasonable transitional services, as set forth on Schedule 3 to this Agreement, and (II) each party will have no further obligations to the other party; and

12.3     If (i) this Agreement is terminated by Per-Se pursuant to the terms set forth in Section 11.3, or (ii) Client fails to make the above-required selection in the allotted time, only the procedures set forth in Section 12.2 will apply with regards to any termination/expiration transition.

13.     **Limitation of Liability; Claims Period.**

13.1     Per-Se shall have no liability for the (a) inability of third parties or systems beyond the control of Per-Se  to accurately process data, or (b) transmission to Per-Se of inaccurate, incomplete or duplicate data.  In all other circumstances, it is expressly understood and agreed that each party's aggregate liability for all loss or damage incurred by the other party, arising from any cause or causes whatsoever under this Agreement, to the extent that such loss or damage is caused by the other party, is limited to the sum of the Fees paid by Client to Per-Se during the Initial Term of this Agreement ("Limitation of Liability").  In no event shall either party's aggregate liability exceed the sum of the Fees paid by Client to Per-Se during the Initial Term of this Agreement.  The parties acknowledge and agree that any claim for damages, including but not limited to a claim for recurring damages arising out of the same cause or event, arising out of this Agreement must be brought no later than six (6) months after the cause of action first arises ("Claims Period").

13.2     Notwithstanding the foregoing, the Limitation of Liability and Claims Period set forth above shall not apply to any civil monetary fine or penalty and interest (but not overpayments) assessed against either party by Medicare, Medicaid or other third-party health insurance provider arising out of the sole negligence or willful misconduct of the other party in the performance of its obligations hereunder.  Overpayments received by Client are the sole responsibility of Client.

13.3     Neither party shall in any event be liable to the other for any indirect, special, incidental, consequential or similar losses or damages suffered by such party or any third party, even if such party has been advised of the possibility of such damages.

**CONFIDENTIAL AND PROPRIETARY**

Client Name:    Emergency Medicine Specialists of Orange County
Contract Number:    RMS136419

13.4     The limitations set forth above reflect a deliberate and bargained for allocation of risks between Per-Se and Client and constitute the basis of the parties' bargain, without which Per-Se and Client would not have agreed to the terms and conditions of this Agreement.

14.     **Notice.**  Any notice, payment, demand or communication required or permitted to be given by the provisions of this Agreement will be effective on the date of receipt if sent or delivered by certified/return receipt mail or by national overnight delivery service to PST Services, Inc., 5995 Windward Parkway, Alpharetta, Georgia 30005, Attention: Senior Vice President and General Manager, with a copy to the General Counsel at the same address, if to Per-Se; and Emergency Medicine Specialists of Orange County, 1010 La Veta, Suite 755, Orange, California 92868, Attention: President, if to Client, or at such other address(es) or to the attention of such other persons as the parties may from time to time designate in writing by notice as set forth above.

15.     **Force Majeure.**  Neither party shall be liable for any failure or delay in performing its obligations under this Agreement due in whole or in material part to any cause beyond its sole control, including but not limited to fire, accident, labor dispute or unrest, flood, riot, war, rebellion, insurrection, sabotage, terrorism, transportation delays, shortage of raw materials, energy or machinery, acts of God or of the civil or military authorities of a state or nation, or the inability, due to the aforementioned causes, to obtain necessary labor or facilities.

16.     **Waiver.**  The failure of either party to enforce any term or condition of this Agreement shall not be construed as a waiver by such party of such term or condition, nor shall a waiver of any breach of a term or condition of this Agreement on any one occasion constitute a waiver of any subsequent breach of the same or similar term or condition.

17.     **Assignment.**  Neither party may assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld, delayed or conditioned; provided, however, that each party hereby consents to any assignment to any successor of the other due to acquisition, merger, consolidation or reorganization, provided that any such assignment shall not alter the terms of the Agreement without the written consent of the non-assigning party; and each party further agrees to cause any successor of such party due to acquisition, merger, consolidation or reorganization to agree to the assignment of this Agreement to such successor, provided that any such assignment shall not alter the terms of the Agreement without the written consent of the non-assigning party.

18.     **Miscellaneous.**  This Agreement contains the entire agreement of the parties relative to the Services to be provided to Client and no representations, warranties, inducements, promises or agreements, oral or otherwise, between the parties not embodied in this Agreement will be of any force or effect. This Agreement specifically supersedes any prior written or oral agreements, understandings, negotiations and proposals between the parties relating to the provision of the Services. The Section headings used herein are for convenience only and shall not be used in the interpretation of this Agreement. If any provision of this Agreement is determined to be invalid or unenforceable, such provision shall be deemed severable from the remainder of this Agreement and shall not cause the invalidity or unenforceability of the remainder of this Agreement. This Agreement has been mutually negotiated by the parties who each had the opportunity to receive the advice of legal counsel and other professional advisors and shall be interpreted in accordance with its terms, without favor to either party. Nothing expressed or implied in this Agreement is intended, or shall be construed, to confer upon or give any person, firm or corporation other than the parties hereto, and their successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, or result in such person, firm or corporation being deemed a third party beneficiary of this Agreement. Any changes to this Agreement will be made by a written amendment to the Agreement and will not be effective until such amendment is signed in ink by authorized representatives of both parties. Per-Se and Client represent and warrant that they have the full power and authority to enter into this Agreement, that there are no restrictions or limitations on their ability to perform this Agreement, and that the person executing this Agreement has the full power and authority to do so.

**EMERGENCY MEDICINE SPECIALISTS OF ORANGE COUNTY**

By: _____

Print Name: _____

Title: _____

Date: _____3-30-12_____

Tax ID#:        953056292

**PST SERVICES, INC.**

By: _____

Print Name: _____Patrick J Leonard_____

Title: _____SVP & GM_____

Date: _____5.11.12_____

**CONFIDENTIAL AND PROPRIETARY**

Client Name:   Emergency Medicine Specialists of Orange County
Contract Number:   RMS136419

## SCHEDULE 1

## SCOPE OF SERVICES

I.   **Per-Se Reimbursement Management Services:**

(a)   Enter demographic information and coding information onto the Per-Se Computer System.

(b)   Handle all accounts in accordance with standard accounting principles and all applicable laws.

(c)   Bill managed care accounts in accordance with the terms of Client's executed contracts.  If no contract exists, bill such accounts in accordance with the rules of the state in which care was provided or, if no state rules apply, in accordance with Per-Se's normal business procedures.

(d)   Account for charts considered not billable (e.g. patient left without being seen, left against medical advice, patient seen by a private physician and any non-billable procedures such as patient recheck, etc.)  These charts will become part of the reporting package, however, Per-Se's fee will not apply to these charts.

(e)   Provide Client's patients with access to their account information via a secured Web site in order for patients to update and/or amend such account information.

(f)   Receive copies of the patient's charts, check for completeness, maintain a daily log of charts received.

(g)   Provide electronic transfer of demographic data from hospital, where available (may require physician involvement).

(h)   Code each patient chart, on the basis of the information provided by Client, including ICD-9 and CPT codes, procedural modifiers and HCPCS Level II regulatory modifiers.

(i)   Provide electronic filing with Medicare, Medicaid and Blue Shield, and other third-party payers, where applicable.

(j)   Provide electronic filing with all major insurance carriers through the Per-Se Exchange or other claims clearinghouse, where applicable.

(k)   Provide electronic remittance from Medicare and all other carriers, where applicable.

(l)   Mail patient statements and notices.

(m)   Provide a toll-free "800" phone number to answer phone inquiries concerning patient account information.

(n)   Respond to inquiries received by mail, fax, telephone or email from patients and/or third-party payers.

(o)   Receive all payment and reimbursement notices from Client's bank lockbox and post payments to the appropriate patient account.

(p)   Provide statements in Client's name.

(q)   File primary, secondary and tertiary insurance for patients and resubmit rejections and no action accounts.

(r)   Back-up data off Computer System every night and store back-up tapes off-site.

(s)   Adapt to all government and third-party payer policy changes.

(t)   Provide monthly management reporting to include:
- aged gross accounts receivable by payer class
- patient and charge volume by managed care carrier
- current month and calendar YTD volume, charges, and Net Collections by provider
- summary of volume and charges by disposition, date of service, and payer class
- summary of cash payments by deposit date and original month of service.

(u)   Provide quarterly management reporting to include:
- standard Per-Se Statistical Analysis Financial Report.  Provide up to three (3) hard-copy books, additional copies available at the cost of five dollars ($5.00) per book.
- standard Per-Se Quarterly Analysis Report.  Provide up to three (3) hard-copy books, additional copies available at the cost of ten dollars ($10.00) per book.
- standard Per-Se Management and Efficiency Reports.  Provide hard-copy books at Client's reasonable request.

(v)   Ad-hoc reports, containing information applicable to Client's practice only.

(w)   Follow up on delinquent insurance accounts.

(x)   Maintain Computer System with Computer System generated operational reports.

(y)   If Client requests Per-Se to forward its unpaid billings to a collection agency, Per-Se will transmit the information required by the collection agency chosen by Client either by hard copy or electronically, in a mutually acceptable format, as requested by such collection agency, pursuant to instructions provided to Per-Se by Client.

(z)   Prepare checks and corresponding back-up information for individual patient and carrier refunds and deliver to Client for Client's signature and release.

(aa)   Make reasonable efforts to identify the owners of unclaimed property.  Notify Client of any unclaimed property.

(bb)   Provide on-site training at Client location (schedule and frequency to be mutually agreed upon).

(cc)   Provide fee schedule consultation, evaluation and development.

(dd)   Provide assistance to Client in regard to its managed care contracts.

**CONFIDENTIAL AND PROPRIETARY**

Client Name:      Emergency Medicine Specialists of Orange County
Contract Number:   RMS136419

|  |  |
|---|---|
| (ee) | Provide physician enrollment (and re-enrollment) for third-party payer contracts provided that Client provides the necessary information and secures the necessary signatures on completed enrollment forms in a timely manner. |
| (ff) | Provide annual charge review and analysis/projections. |
| (gg) | Provide annual impact analysis of Medicare reductions and/or participation evaluation and recommendation. |
| (hh) | At Client's request, collect and submit PQRS measures on Client's behalf. |
| (ii) | Assist Client with responses to RAC audits. |
| (jj) | Provide a full-time employee on-site at Client to assist with charge capture. |

II.   **Client Responsibilities:**

(a)   On a timely basis and in a mutually acceptable format, provide the following information necessary for Per-Se to perform the Services in an efficient manner. Such information may include:

(1)   patient's name, sex, date of birth, status (single, married, other)
(2)   responsible party's name, address, telephone number, employer
(3)   insured's name (if different from patient), sex, date of birth, address, relationship to patient, insured's employer (if group policy), insured's employer's address
(4)   name of insurance company, address, policy certificate number, group policy number
(5)   copy of emergency registration log (census)
(6)   Chart template, dictated report or similar type report (if used)
(7)   copy of release of information and insurance assignment of benefits, upon request by Per-Se
(8)   HMO/PPO authorization numbers approvals (if applicable)
(9)   copy of paid at time of service receipt (if applicable)
(10)  date of service, chief complaint, medical history and exam, treatment, final diagnosis and physicians' notes.

Client acknowledges and agrees that, if it fails to provide Per-Se such information and Per-Se is unable to provide the Services, to the extent that Per-Se's inability to provide the Services is due to Client's failure to provide the information, Per-Se has no responsibility for providing Services to such accounts and no liability to Client resulting therefrom.

(c)   Furnish a complete daily batch of those Department Records for which Per-Se is to provide the Services. If medical records are missing and/or inaccurate or incomplete, they will be identified by Per-Se and Client and/or hospital staff will locate the missing records and/or obtain the incomplete and/or inaccurate data..

(d)   Furnish and/or cause to be transmitted and mailed to Per-Se, no less than every other business day and within three (3) business days of service, a copy of the medical record for each patient for whom Per-Se provides the Services. The record shall include the Emergency Department Record, chart template or dictation (if used) or similar reports.

(e)   Work with Per-Se to establish electronic transmission of patients' demographic and financial information.

(f)   Provide access to one (1) or more members of Client's staff to answer questions regarding claims.

(g)   Notify Per-Se of patients who qualify for free or reduced charge services due to financial hardship.

(h)   Send copies of workers' compensation notification of compensable injury forms.

(i)   Provide Per-Se with Client's fee schedule for entry onto Per-Se's Computer System prior to the Commencement Date of this Agreement. Per-Se will continue to update such fee schedule upon written notification to Per-Se of any change to such fee schedule by Client.

(j)   Facilitate Hospital's report distribution of unallocated and/or unidentified funds or receipts, if applicable.

(k)   Provide Per-Se with an electronic file, if available, of Client's referring physicians, including unique, identifying codes, UPIN and license numbers as of the Effective Date of this Agreement. Provide Per-Se with electronic updates, if available, to this file, containing similar required data, on a minimum monthly basis.

(l)   Provide Per-Se with copies of contracted agreements with managed care plans, including the negotiated fee schedules.

(m)   If Client requests Per-Se to forward its unpaid billings to a collection agency, Client shall: (1) provide Per-Se with written notice of the name and address of the collection agency chosen by Client (any contract for the provision of collection services for Client's unpaid billings shall be between Client and the collection agency chosen by Client); (2) provide Per-Se with written instructions on which unpaid billings shall be forwarded to such collection agency; and (3) if applicable, provide Per-Se with written authorization to execute documents presented to Per-Se and considered necessary for the collection of Client's unpaid billings by such collection agency on Client's behalf in accordance with the written instructions of Client. Client acknowledges and agrees that Client is solely responsible for the unpaid billings placed with such collection agency and further agrees to hold Per-Se harmless from and against any fines or penalties incurred as a result of the placement of such unpaid billings with such collection agency.

(n)   Sign and release refund checks for individual patient and carrier refunds prepared for Client's signature by Per-Se within thirty (30) days of receipt of such refund checks from Per-Se.

**CONFIDENTIAL AND PROPRIETARY**

Client Name:    Emergency Medicine Specialists of Orange County
Contract Number:    RMS136419

    (o)    If Client contracts with a physician not under the employ of Client to provide services for Client, Client will notify Per-Se prior to such physician beginning to provide services for Client. If Per-Se is to provide the Services for such physician, Client agrees that such physician must enter into an agreement for the performance of the Services with Per-Se with respect to such physician's accounts receivable.

    (p)    Prepare and release Client's annual unclaimed property return.

    (q)    Cause all payment and reimbursement notices from Client's bank lockbox to be sent to Per-Se on a daily basis so that Per-Se may timely post payments to the appropriate patient account, until the end of the Workout Period, if applicable.

    (r)    Provide names, detailed summary information and copies of applicable licenses for physicians for initiation of payer enrollment by Per-Se, secure the necessary signatures on completed enrollment forms in a timely manner and coordinate the timely return of completed and signed physician enrollment applications and electronic claim submission authorization forms for all physicians.

**CONFIDENTIAL AND PROPRIETARY**      Client Name:      Emergency Medicine Specialists of Orange County

Contract Number:   RMS136419

## SCHEDULE 2

### SERVICE FEES

A.      Beginning as of the Commencement Date, or such other date set forth below, Client agrees to pay Per-Se the Fees as set forth below:

(i)      an amount equal to five and nine tenths percent (5.90%) of the Net Collections made on Client's accounts receivable, except for Client's Medi-Cal and Medi-Cal Managed Care accounts receivable, during the previous month; and

(ii)     an amount equal to six dollars ($6.00) per chart, regardless of the amount of the charges associated with any such chart and the amount of reimbursement, if any, to Client with respect to those of Client's charges for which reimbursement from the Medi-Cal program or any third-party administrator for the Medi-Cal program is sought by Per-Se on Client's behalf; and

(iii)    Per-Se will credit Client on each monthly invoice an amount equal to the monthly lockbox fee paid by Client during the previous month for bank lockbox services required by Per-Se under this Agreement, up to a maximum monthly amount of six thousand dollars ($6,000.00), upon receipt's receipt of a copy of Client's invoice for such lockbox fees.

Net Collections means the total sum of all monies collected for services rendered by Client, less amounts refunded or credited to a patient or third party payer as a result of overpayments, erroneous payments or bad checks. When unpaid billings are referred to a Collection Agent or returned to Client for any reason (the "Collection Accounts"), the amount of Net Collections will not include the net amount received by Client through the efforts of the Collection Agent. Client acknowledges that, although Per-Se may facilitate Client's relationship with the Collection Agent, the selection of the Collection Agent to handle Client's accounts is the responsibility of Client, the contract with the Collection Agent chosen by Client shall be between the Collection Agent and Client, and Client agrees to pay directly any Collection Agent commissions and/or fees and costs.

B.      Global/Technical/Purchased Service/Place of Service:  Client represents that it is not requesting Per-Se to bill globally and/or for the technical component, including supplies, and/or for purchased services and instructs Per-Se to bill only for the professional component of Client's accounts receivable.  Client will complete the *Place of Service Form* during the implementation process instructing Per-Se to bill its accounts as a facility and/or non-facility place of service.

C.      Invoicing, Payment and Fee Change.  Beginning as of the Commencement Date, Client agrees to pay the Fee and all other charges set forth in the Agreement within thirty (30) days of its receipt of each invoice from Per-Se.  Late payments by Client will result in a late payment charge equal to the lesser of one and one-half percent (1.5%) per month or the maximum monthly rate allowed by applicable law.  Client agrees to reimburse Per-Se for all reasonable out of pocket costs and expenses, including reasonable attorneys' fees but excluding overnight delivery and messenger fees, incurred by Per-Se in enforcing collection of any monies due to it under this Agreement.  In addition to the foregoing and without waiver of its rights under Section 11.3 of the Agreement, Per-Se may suspend (upon ten (10) days prior written notice to Client) the performance of the Services hereunder during any period in which invoices are more than thirty (30) days past due without incurring any liability to Client.

Either party may request a change in the Fee in the event of a material change in legislation, Client's business or other market conditions which results in a material change in either the cost associated with Per-Se's provision of the Services or Per-Se's anticipated revenues under this Agreement. Per-Se may request a change in the Fee in the event (i) Client fails to disclose to Per-Se, at or prior to the time this Agreement is executed, information relating to Client's practice, which information, if disclosed, would have led Per-Se to propose a higher Fee or (ii) any of the information provided by Client to Per-Se upon which the practice assumptions set forth below are based is or becomes inaccurate. In the event either party requests a change in the Fee, the requesting party will provide the non-requesting party with ninety (90) days' prior written notice (the "Notice Period") of the requested change (the "Notice") and such fee change will be effective at the end of the Notice Period.  If the non-requesting party provides the requesting party written notice during any such Notice Period that any such fee change request is unacceptable to the non-requesting party, the Agreement will terminate at the end of the Notice Period and the Fee in place at that time will remain in effect until the end of the Workout Period, if any.

D.      Practice Assumptions:  The following assumptions are based on information Client has provided to Per-Se.  Based on these assumptions, Per-Se has derived the schedule of Fees set forth above.

| | | |
|---|---|---|
| 1. | Average gross charges per month: | $4,838,517.00 |
| 2. | Payer mix: | |
| | Self Pay | 14.4% |
| | Medicare | 16.2% |
| | Medicaid | 4.2% |
| | Medicaid Managed Care | 21.5% |
| | Medi-Cal/Medi-Cal Managed Care | 6.9% |
| | Non-Contracted | 10.4% |
| | Contracted | 22.8% |

**CONFIDENTIAL AND PROPRIETARY**

Client Name:  Emergency Medicine Specialists of Orange County
Contract Number:  RMS136419

|  |  |  |
|---|---|---|
| | Workers Comp | 0.7%% |
| | Other, Misc. | 2.9% |
| 3. | Average Net Collections per month: | $1,336,047.00 |
| 4. | Average number of encounters per month: | 9,398. |

E.    Additional Fees:

1.    Services Rendered Fee:  In the event of termination or expiration of this Agreement, and the option set forth in Section 12.2 is the procedure for transferring Client's accounts receivable to another entity pursuant to such termination, for Client's accounts receivable for which Client pays Per-Se a Fee based on a percentage of the Net Collections, the Services Rendered Fee shall be equal to the average monthly invoice for the six (6) months immediately preceding the effective date of such termination multiplied by one and one-half (1.5).  No Services Rendered Fee shall apply for Client's accounts receivable for which Client pays Per-Se a Fee based on a set dollar amount per transaction.

F.    Line of Credit:  The parties acknowledge and agree that Client's "Average Monthly Net Collections" is an amount equal to one million three hundred thirty-six thousand forty-seven dollars ($1,336,047.00) and that Client's prior billing company (the "Prior Billing Company") is providing billing services for Client's accounts receivable with dates of service prior to the Commencement Date (the "Prior A/R").  If the actual Net Collections in any month (the "Actual Monthly Net Collections") during the first (1st) four (4) months of the Initial Term (the "Draw Period") is an amount equal to five percent (5.0%) or more less than the monthly targeted amounts set forth below (each amount a "Monthly Targeted Amount") and Client elects to draw the shortfall between the Actual Monthly Net Collections and the then-current Monthly Targeted Amount from a line of credit established by Client, Per-Se will pay the interest charges on such draw, provided that the interest on such line of credit is a competitive rate within Client's geographic area. Client will provide Per-Se written verification of the Actual Monthly Net Collections made on the Prior A/R for each month of the Draw Period sufficient for Per-Se to verify such amounts. In the event Client draws on such line of credit, any Actual Monthly Net Collections in excess of the Monthly Targeted Amount in any month during the Draw Period will be applied to the repayment of any such draws. Client agrees that Per-Se will not be required to pay the interest on any draw on such line of credit if (i) Client fails to apply any Actual Monthly Net Collections in excess of the Monthly Targeted Amount in any month during the Draw Period to the repayment of any such draws, and/or (ii) any event occurs which adversely affects the Actual Monthly Net Collections, including but not limited to, material changes in Client's business (including, without limitation, a material reduction in procedure volume, a material change in payer mix, or changes in Client's contractual reimbursements), changes in legislation, any interruption in payments from institutional government programs, including Medicare or Medicaid) payer bankruptcies, managed care contract disputes between payers and Client, and/or changes in other market conditions. The parties further acknowledge and agree that, after the end of the Draw Period, Per-Se is no longer required to pay Client interest on any outstanding amounts of the draw(s) on such line of credit taken by Client during the Draw Period. Client shall continue to pay Per-Se any Actual Monthly Net Collections in excess of the Average Monthly Net Collections in any month after the Draw Period until the interest paid to Client by Per-Se for any draw on such line of credit has been recouped by Per-Se.

| Month During Draw Period | Percentage of Average Monthly Net Collections | Monthly Targeted Amount |
|---|---|---|
| One (1) | 92.64% | $1,237,714.00 |
| Two (2) | 33.78% | $448,079.00 |
| Three (3) | 21.11% | $282,040.00 |
| Four (4) | 16.21% | $216,573.00. |

G.    Transition Plan:  The parties acknowledge and agree that Client's "Average Monthly Net Collections" is an amount equal to one million three hundred thirty-six thousand forty-seven dollars ($1,336,047.00).  If the "Actual Monthly Net Collections" made during the first (1st) six (6) months of the Initial Term (the "Transition Draw Period") is an amount less than the prorated monthly percentage amount of the Average Monthly Net Collections as set forth below (each amount a "Monthly Targeted Amount"), (each such negative variance a "Shortfall"), Per-Se will pay through Per-Se's current invoice an amount equal to the Shortfall, and if the Shortfall is greater than the current invoice amount, will wire transfer or write a check to Client for the remainder of the Shortfall.  If the Actual Monthly Net Collections made by or through Per-Se in any month during the Transition Draw Period is an amount equal to or more than the Monthly Targeted Amount, (each such positive variance a "Surplus"), Client will pay the current invoice in full and the Surplus will be carried forward to offset future Shortfalls.  Client agrees that Per-Se will not be required to credit and/or pay Client any Shortfall if any event beyond Per-Se's control occurs which adversely affects the Actual Monthly Net Collections, including but not limited to, material changes in Client's business (including, without limitation, a material reduction in procedure volume, a material change in payer mix, or changes in Client's contractual reimbursements), changes in legislation, any interruption in payments from institutional government programs, including Medicare or Medicaid) payer bankruptcies, untimely return of enrollment forms or information to Per-Se by Client, late charge documentation submissions by Client (documentation submitted to Per-Se more than fifteen (15) days after the date on which the services were rendered), managed care contract disputes between payers and Client, and/or changes in other market conditions.

**CONFIDENTIAL AND PROPRIETARY**    Client Name:    Emergency Medicine Specialists of Orange County
                                    Contract Number:    RMS136419

| Month During Transition Draw Period | Percentage of Average Monthly Net Collections | Monthly Targeted Amount |
|---|---|---|
| One (1) | 0.6896% | $9,213.00 |
| Two (2) | 42.40976% | $566,614.00 |
| Three (3) | 70.09718% | $936,532.00 |
| Four (4) | 82.40755% | $1,101,004.00 |
| Five (5) | 86.45169% | $1,155,036.00 |
| Six (6) | 95.8122% | $1,280,096.00 |

Example:    At the beginning of month 3, there is a Surplus = $15,000.00 from months 1 and 2.
For month 3, the Shortfall = $12,000.00.
Per-Se will apply the $15,000.00 Surplus to the $12,000.00 Shortfall and Client will pay the entire invoice amount for month 3.
A Surplus of $3,000.00 will remain to be applied to any Shortfall for month 4.

During the six (6)-month period (months seven (7) through and including twelve (12) of the Initial Term) following the end of the Transition Draw Period (the "Recoupment Period"), if the Actual Monthly Net Collections exceed the Recoupment Period Targeted Amount (as set forth below) for any month during the Recoupment Period, Client will pay Per-Se any Monthly Net Collections in excess of the Recoupment Period Targeted Amount for that month to reimburse Per-Se for any outstanding Shortfall credits and/or payments made to Client during the Draw Period. The parties further acknowledge and agree that, after the end of the Recoupment Period, Client is no longer required to pay Per-Se any outstanding Shortfall amount.

| Month During Recoupment Period | Percentage of Average Monthly Net Collections | Recoupment Period Targeted Amount |
|---|---|---|
| Seven (7) | 95.8122% | $1,280,096.00 |
| Eight (8) | 100.0% | $1,336,047.00 |
| Nine (9) | 100.0% | $1,336,047.00 |
| Ten (10) | 100.0% | $1,336,047.00 |
| Eleven (11) | 100.0% | $1,336,047.00 |
| Twelve (12) | 100.0% | $1,336,047.00 |

H.    Loan and Security:

(1)    Provided that Client has signed this Agreement, within ten (10) business days of the Commencement Date of this Agreement, Per-Se will loan Client an amount equal to one hundred thousand dollars ($100,000.00) (the "Loan"). Client shall repay such Loan and all accrued interest through the Fee set forth above in Section A of this Schedule 2 (the "Monthly Loan Repayment Amount"). Client shall pay Per-Se interest on such Loan in an amount equal to the Prime Rate on an annual basis. The Loan shall be amortized on a straight line basis over the twenty-four (24) months of the Initial Term. Upon notice of termination of this Agreement for any reason prior to the end of the Initial Term, including but not limited to Client's notice of termination pursuant to the terms set forth in Section 11.1 of the Agreement, Client acknowledges and agrees that all outstanding unamortized or unpaid Loan amounts and all interest accrued prior to the date of termination are immediately due and payable to Per-Se by Client without any right of set-off. For purposes of determining the unamortized or unpaid amounts hereunder, any partial month shall be counted as a full month. Client acknowledges and agrees that (i) Per-Se is not obligated to make the Loan to Client; and (ii) the fact that Per-Se has agreed to the terms set forth herein shall not be disclosed to any third party except with Per-Se's written permission other than to Client's officials, employees, and agents with a need to know such information and who have agreed to the confidentiality obligations set forth herein, or as required by applicable law.

(2)    To secure the prompt and complete payment, observance and performance when due of all obligations of Client under this Section H of the Agreement, Client hereby collaterally assigns and pledges to Per-Se, and grants to Per-Se, a security interest in Client's right title and interest in and to Client's accounts receivable up to a maximum amount of the Loan paid to Client, plus reasonable costs of collection (including reasonable attorneys' fees), other than any accounts receivable payable to Client by Medicare or Medicaid or any other governmental agency or governmental provider, wherever located and whether now or hereafter existing, or now owned or hereafter acquired or arising and any and all products and proceeds of the foregoing (the "Collateral"). Client hereby represents and warrants to Per-Se that (a) it conducts its medical practice only in the State of California, (b) none of the Collateral is, as of the date hereof, subject to any other lien or encumbrance, (c) no financing statement under the Uniform Commercial Code of any jurisdiction which names Client as debtor or covers any of the Collateral, or any other notice filed in the public records indicating the existence of a lien or other encumbrance thereon, has been filed and is still effective in any jurisdiction, and (d) Client has not signed any such financing statement or notice or any security agreement authorizing any person to file any such financing statement or notice. The security interest granted herein shall at all times be valid, perfected and of first priority and enforceable against Client and all other persons, in accordance with the terms contained herein, as security for the obligations hereunder. Client shall take all actions that may be necessary, or that Per-Se may reasonably request, so as at all times to maintain the validity, perfection, enforceability and priority of the security interest in the Collateral in conformity with the immediately preceding sentence, or to enable Per-Se to exercise or enforce its rights hereunder. In that regard, Client hereby authorizes Per-Se to

file in all necessary and appropriate jurisdictions (as determined by Per-Se) one or more financing statements (or any other document or instrument referred to in this Section) in the name of Client and without the signature of Client to the extent permitted by applicable law.

**CONFIDENTIAL AND PROPRIETARY**

Client Name:      Emergency Medicine Specialists of Orange County
Contract Number:  RMS136419

## SCHEDULE 3

## TRANSITION SPECIFICS

Upon termination or expiration of this Agreement for any reason, Per-Se agrees to provide the following assistance to Client or Client's designated agent in order to transfer Per-Se's responsibilities under this Agreement to Client or Client's designated agent:

| | |
|---|---|
| **Data specifications** | Patient information will be provided via a write-protected CD. <br> Detailed specifications will be provided to Client or Client's designated agent. |
| **Technical and Operational contacts** | Per-Se Support contacts will be provided to answer questions regarding the specifications document and operational requirements. <br> Questions may be presented by Client or its designee. |
| **Test CD** | A test CD will be provided containing five hundred (500) patient accounts and their associated transaction activity |
| **Final CD** | Final CD will include all debit and credit balance accounts residing in the active AR. <br> Zero balance accounts will be provided up to the age of two (2) years (based on the date the account was placed on the system). <br> Patient demographic and transaction information is included. |
| **Utility file codes** | Listings will be provided to Client or its designee for the following files: <br>     Charge codes, description and CPT <br>     Referring physician code, name, NPI (if available) <br>     Performing physician, code, name <br>     Location of service, code, description <br>     Transaction codes, description |

CONFIDENTIAL AND PROPRIETARY

Client Name:     Emergency Medicine Specialists of Orange County
Contract Number:  RMS136419

### SCHEDULE 4

### BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("BAA") is a Schedule to the Agreement entered into by and between PST Services, Inc. ("Per-Se") and Emergency Medicine Specialists of Orange County ("Client") and is effective as of Effective Date of the Agreement.

### RECITALS

A.  Per-Se is providing Services to Client under the Agreement, and Client wishes to disclose certain information to Per-Se pursuant to the terms of such Agreement, some of which may constitute Protected Health Information ("PHI") (defined below).

B.  Client and Per-Se intend to protect the privacy and provide for the security of PHI disclosed to Per-Se pursuant to the Agreement in compliance with (i) the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-191 ("HIPAA"), and regulations promulgated thereunder by the U.S. Department of Health and Human Services (the "HIPAA Regulations"); and (ii) Subtitle D of the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act"), also known as Title XIII of Division A and Title IV of Division B of the American Recovery and Reinvestment Act of 2009, Public Law No. 111-005 ("ARRA").

C.  The purpose of this BAA is to satisfy certain standards and requirements of HIPAA, the Privacy Rule and the Security Rule (as those terms are defined below), and the HITECH Act, including, but not limited to, Title 45, §§ 164.314(a)(2)(i), 164.502(e) and 164.504(e) of the Code of Federal Regulations ("C.F.R."), and 42 U.S.C. §§ 17931(a) and 17934(a).

### SECTION 1: DEFINITIONS

"**Breach**" shall have the same meaning given to such term in 42 U.S.C. § 17921(1) and 45 C.F.R. § 164.402.

"**Designated Record Set**" shall have the same meaning as the term "designated record set" in 45 C.F.R. § 164.501.

"**Electronic Health Record**" shall have same meaning given to such term in 42 U.S.C. § 17921(5).

"**Electronic Protected Health Information**" or "**Electronic PHI**" shall have the meaning given to such term under the Privacy Rule and the Security Rule, including, but not limited to, 45 C.F.R. § 160.103, as applied to the information that Per-Se creates, receives, maintains or transmits from or on behalf of Client.

"**Individual**" shall have the same meaning as the term "individual" in 45 C.F.R. § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

"**Privacy Rule**" shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Parts 160 and 162 and Part 164, Subparts A and E.

"**Protected Health Information**" or "**PHI**" shall have the same meaning as the term "protected health information" in 45 C.F.R. § 160.103, as applied to the information created or received by Per-Se from or on behalf of Client.

"**Required by Law**" shall have the same meaning as the term "required by law" in 45 C.F.R. § 164.103.

"**Secretary**" shall mean the Secretary of the Department of Health and Human Services or his or her designee.

"**Security Incident**" shall have the meaning given to such term in 45 C.F.R. § 164.304, but shall not include, (a) unsuccessful attempts to penetrate computer networks or servers maintained by Per-Se and (b) immaterial incidents that occur on a routine basis, such as general "pinging" or "denial of service" attacks.

"**Security Rule**" shall mean the Security Standards at 45 C.F.R. Parts 160 and 162 and Part 164, Subparts A and C.

"**Unsecured PHI**" shall have the same meaning given to such term under 42 U.S.C. § 17931(h), and guidance promulgated thereunder.

Capitalized Terms. Capitalized terms used in this BAA and not otherwise defined herein shall have the meanings set forth in the Privacy Rule, the Security Rule, and the HITECH Act, which definitions are incorporated in this BAA by reference.

### SECTION 2: PERMITTED USES AND DISCLOSURES OF PHI

2.1  Uses and Disclosures of PHI Pursuant to the Agreement. Except as otherwise limited in this BAA, Per-Se may use or disclose PHI to perform Services for, or on behalf of, Client as specified in the Agreement, provided such use or disclosure would not violate the Privacy Rule if done by Client.

2.2  Permitted Uses of PHI by Per-Se. Except as otherwise limited in this BAA, Per-Se may use PHI for providing Services to Client under the Agreement or to carry out the legal responsibilities of Per-Se.

2.3  Permitted Disclosures of PHI by Per-Se. Except as otherwise limited in this BAA, Per-Se may disclose PHI for providing Services to Client under the Agreement, provided that the disclosures are Required by Law, or Per-Se obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and will be used or further disclosed only as

**CONFIDENTIAL AND PROPRIETARY**     Client Name:     Emergency Medicine Specialists of Orange County
                                     Contract Number:  RMS136419

Required by Law or for the purpose for which it was disclosed to the person (which purpose must be consistent with the limitations imposed upon Per-Se pursuant to this BAA), and that the person agrees to notify Per-Se of any instances of which it is aware in which the confidentiality of the information has been breached. Per-Se may use PHI to report violations of law to appropriate federal and state authorities, consistent with 45 C.F.R. § 164.502(j)(1).

2.4    Data Aggregation. Except as otherwise limited in this BAA, Per-Se may use PHI to provide Data Aggregation services as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B), including use of PHI for statistical compilations, reports, research and all other purposes allowed under applicable law, (the "Uses") and such Uses shall be the sole and exclusive property of Per-Se.

2.5    De-identified Data. Per-Se may create de-identified PHI in accordance with the standards set forth in 45 C.F.R. § 164.514(b) and may use or disclose such de-identified data for any purpose.

2.6    Disclosure Pursuant to Authorization. Without limiting the generality of the foregoing, Per-Se reserves the right at its sole discretion to disclose an Individual's PHI in response to and in accordance with a valid authorization executed by such Individual that meets the requirements set forth in the Privacy Rule.

SECTION 3:     OBLIGATIONS OF PER-SE

3.1    Appropriate Safeguards.

         3.1.1    Privacy of PHI. Per-Se will develop, implement, maintain, and use appropriate safeguards to prevent use or disclosure of PHI other than as provided for by the Agreement and this BAA. The safeguards must reasonably protect PHI from any intentional or unintentional use or disclosure in violation of the Privacy Rule and this BAA, and limit incidental uses or disclosures made pursuant to a use or disclosure otherwise permitted by this BAA.

         3.1.2.    Security of PHI. Per-Se will develop, implement, maintain, and use appropriate administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of Electronic PHI, as required by the Security Rule. Commencing on February 17, 2010, Per-Se will comply with the provisions of 45 C.F.R. §§ 164.308, 164.310, 164.312 and 164.316 relating to implementation of administrative, physical and technical safeguards with respect to Electronic PHI in the same manner that such provisions apply to a HIPAA covered entity. Per-Se will also comply with any additional security requirements contained in the HITECH Act that are applicable to a business associate.

3.2    Reporting of Improper Use or Disclosure, Security Incident or Breach. Client and Per-Se acknowledge that Per-Se is an independent contractor (and not an agent) to Client. As such, under the HITECH Act, the notification period for Client to disclose a Breach begins at the time Per-Se notifies Client of a Breach. Per-Se will report to Client any use or disclosure of PHI not provided for by the Agreement of which it becomes aware. Per-Se will report to Client any Security Incident of which it becomes aware. Per-Se will notify Client of any Breach of Unsecured PHI as soon as practicable, and no later than thirty (30) days after discovery of such Breach. Per-Se's notification to Client of a Breach will include: (a) the identification of each Individual whose Unsecured PHI has been, or is reasonably believed by Per-Se to have been, accessed, acquired or disclosed during the Breach; and (b) any particulars regarding the Breach that Client would need to include in its notification, as such particulars are identified in 42 U.S.C. § 17932 and 45 C.F.R. § 164.404.

3.3    Per-Se's Agents. Per-Se will ensure that any agent or subcontractor to whom it provides PHI received from, or created or received by Per-Se on behalf of Client, agrees to restrictions and conditions that are substantially similar to those that apply through this BAA to Per-Se with respect to such PHI. Per-Se will ensure that any agent, including a subcontractor, to whom it provides Electronic PHI agrees to implement reasonable and appropriate safeguards to protect such information.

3.4    Access to PHI. To the extent Per-Se possesses PHI in a Designated Record Set, Per-Se agrees to make such information available to Client pursuant to 45 C.F.R. § 164.524 and 42 U.S.C. § 17935(e)(1), as applicable, within ten (10) business days of Per-Se's receipt of a written request from Client; provided, however, that Per-Se is not required to provide such access where the PHI contained in a Designated Record Set is duplicative of the PHI contained in a Designated Record Set possessed by Client. If an Individual makes a request for access pursuant to 45 C.F.R. § 164.524 directly to Per-Se, or inquires about his or her right to access, Per-Se will direct the Individual to Client. Any disclosure of, or decision not to disclose, the PHI is the sole responsibility of Client.

3.5    Amendment of PHI. To the extent Per-Se possesses PHI in a Designated Record Set, Per-Se agrees to make such information available to Client for amendment pursuant to 45 C.F.R. § 164.526 within twenty (20) business days of Per-Se's receipt of a written request from Client. If an Individual submits a request for amendment pursuant to 45 C.F.R. § 164.526 directly to Per-Se, or inquires about his or her right to amendment, Per-Se will direct the Individual to Client. Any amendment of, or decision not to amend, the PHI is the sole responsibility of Client.

3.6    Documentation of Disclosures. Per-Se agrees to document such disclosures of PHI and information related to such disclosures as would be required for Client to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528, and 42 U.S.C. § 17935(c), as applicable. Per-Se will document, at a minimum, the following information ("Disclosure Information"): (a) the date of the disclosure; (b) the name and, if known, the address of the recipient of the

PHI; (c) a brief description of the PHI disclosed; (d) the purpose of the disclosure that includes an explanation of the basis for such disclosure; and (e) any additional information required under the HITECH Act and any implementing regulations.

3.7    Accounting of Disclosures.  Per-Se agrees to provide to Client, within twenty (20) business days of Per-Se's receipt of a written request from Client, information collected in accordance with Section 3.6 of this BAA, to permit Client to respond to a request by an Individual for an accounting of disclosures of PHI in accordance with 45 C.F.R. § 164.528, and 42 U.S.C. § 17935(c), as applicable.

3.8    Governmental Access to Records.  Per-Se will make its internal practices, books and records relating to the use and disclosure of PHI received from, or created or received by Per-Se on behalf of, Client available to the Secretary for purposes of the Secretary determining Client's compliance with the Privacy Rule and the Security Rule.

3.9    Mitigation.  To the extent practicable, Per-Se will cooperate with Client's efforts to mitigate a harmful effect that is known to Per-Se of a use or disclosure of PHI not provided for in this BAA.

3.10    Minimum Necessary.  Per-Se will request, use and disclose the minimum amount of PHI necessary to accomplish the purpose of the request, use or disclosure, in accordance with 42 U.S.C. § 17935(b) and regulations promulgated thereunder.

3.11    Limitation on Marketing.  Per-Se may use and disclose PHI for marketing purposes only as expressly directed by Client, and in accordance with 42 U.S.C. § 17936(a).  Per-Se will not use or disclose PHI for fundraising purposes.

3.12    Limitation on Sale of Electronic Health Records and PHI.  Per-Se will comply with the prohibition on the sale of Electronic Health Records and PHI set forth in 42 U.S.C. § 17935(d).

3.13    HITECH Act Applicability.  Per-Se acknowledges that enactment of the HITECH Act amended certain provisions of HIPAA in ways that now directly regulate, or will on future dates directly regulate, Per-Se under the Privacy Rule and Security Rule.  To the extent not referenced or incorporated herein, requirements applicable to Per-Se under the HITECH Act are hereby incorporated by reference into this BAA.  Per-Se agrees to comply with applicable requirements imposed under the HITECH Act, as of the effective date of each such requirement.

## SECTION 4: OBLIGATIONS OF CLIENT

4.1    Notice of Privacy Practices.  Client will provide its patients with its notice of privacy practices in accordance with 45 C.F.R. § 164.520.

4.2    Notification of Changes Regarding Individual Permission.  Client will notify Per-Se of any changes or limitation(s) in, or revocation of, permission by an Individual to use or disclose PHI, to the extent that such changes may affect Per-Se's use or disclosure of PHI.  Client will provide such notice no later than fifteen (15) days prior to the effective date of the change.  Client will obtain any consent or authorization that may be required by the Privacy Rule, or applicable state law, prior to furnishing Per-Se with PHI.

4.3    Notification of Restrictions to Use or Disclosure of PHI.  Client will notify Per-Se of any restriction to the use or disclosure of PHI that Client has agreed to in accordance with 45 C.F.R. § 164.522 or 42 U.S.C. § 17935(a), to the extent that such restriction may affect Per-Se's use or disclosure of PHI.  Client will provide such notice no later than fifteen (15) days prior to the effective date of the restriction.  If Per-Se reasonably believes that any restriction agreed to by Client pursuant to this Section may materially impair Per-Se's ability to perform its obligations under the Agreement or this BAA, the parties will mutually agree upon any necessary modification of Per-Se's obligations under such agreements.

4.4    Permissible Requests by Client.  Client will not request Per-Se to use or disclose PHI in any manner that would not be permissible under the Privacy Rule, the Security Rule or the HITECH Act if done by Client, except as permitted pursuant to the provisions of Sections 2.2, 2.3, 2.4, 2.5 and 2.6 of this BAA.

## SECTION 5: TERM AND TERMINATION

5.1    Term.  The term of this BAA will commence as of the BAA Effective Date, and will terminate on the latest of: (a) the date when all of the PHI provided by Client to Per-Se, or created or received by Per-Se on behalf of Client, is destroyed or returned to Client, (b) the termination date of this BAA, or (c) the termination of the Agreement.  If it is infeasible to return or destroy PHI or Per-Se maintains PHI in connection with its internal records information and management policy, protections are extended to such information, in accordance with Section 5.3.

5.2    Termination for Cause.  Upon either party's knowledge of a material breach by the other party of this BAA, such party will provide written notice to the breaching party detailing the nature of the breach and providing an opportunity to cure the breach within thirty (30) business days.  Upon the expiration of such thirty (30) day cure period, the non-breaching party may terminate this BAA and, at its election, the Agreement, if cure is not possible.

5.3     Effect of Termination.

        5.3.1     Except as provided in Section 5.3.2, upon termination of the Agreement or this BAA for any reason, Per-Se will return or destroy all PHI received from Client, or created or received by Per-Se on behalf of Client, and will retain no copies of the PHI. This provision will apply to PHI that is in the possession of subcontractors or agents of Per-Se.

        5.3.2     If it is infeasible for Per-Se to return or destroy the PHI upon termination of the Agreement or this BAA or Per-Se maintains PHI in connection with its internal records information and management policy, Per-Se will: (a) extend the protections of this BAA to such PHI; (b) limit further uses and disclosures of such PHI to those purposes that make the return or destruction infeasible, for so long as Per-Se maintains such PHI; and (c) never disclose such PHI to another Per-Se client or third party unless such information has been de-identified in accordance with the standards set forth in 45 C.F.R. § 164.514(b).

## SECTION 6: SURVIVAL

The respective rights and obligations of Per-Se under Section 5.3 of this BAA will survive the termination of the BAA and the Agreement.

## SECTION 7: EFFECT OF BAA

In the event of any inconsistency between the provisions of this BAA and the Agreement, the provisions of the BAA will control. In the event of inconsistency between the provisions of this BAA and mandatory provisions of the Privacy Rule, the Security Rule or the HITECH Act, as amended, or their interpretation by any court or regulatory agency with authority over Per-Se or Client, such interpretation will control; provided, however, that if any relevant provision of the Privacy Rule, the Security Rule or the HITECH Act is amended in a manner that changes the obligations of Per-Se or Client that are embodied in terms of this BAA, then the parties agree to negotiate in good faith appropriate non-financial terms or amendments to this BAA to give effect to such revised obligations. Where provisions of the BAA are different from those mandated in the Privacy Rule, the Security Rule, or the HITECH Act, but are nonetheless permitted by such rules as interpreted by courts or agencies, the provisions of the BAA will control.

## SECTION 8: GENERAL

This BAA is governed by, and will be construed in accordance with, the laws of the State that govern the Agreement. Any action relating to this BAA must be commenced within six (6) months after the date upon which the cause of action accrued. Client will not assign this BAA without the prior written consent of Per-Se, which will not be unreasonably withheld. If any part of a provision of this BAA is found illegal or unenforceable, it will be enforced to the maximum extent permissible, and the legality and enforceability of the remainder of that provision and all other provisions of this BAA will not be affected. All notices relating to the parties' legal rights and remedies under this BAA will be provided in writing to a party, will be sent to its address set forth in the Agreement, or to such other address as may be designated by that party by notice to the sending party, and will reference this BAA. This BAA may be modified, or any rights under it waived, only by a written document executed by the authorized representatives of both parties. Nothing in this BAA will confer any right, remedy, or obligation upon anyone other than Client and Per-Se or result in such person, firm or corporation being deemed a third party beneficiary of this Agreement. This BAA is the complete and exclusive agreement between the parties with respect to the subject matter hereof, superseding and replacing all prior agreements, communications, and understandings (written and oral) regarding its subject matter.

PST SERVICES, INC.

By: _____

Print Name: _Patrick J. Leonard_

Title: _____SVP & GM_____

Date: _____5.11.12_____

EMERGENCY MEDICINE SPECIALISTS OF
ORANGE COUNTY

By: _____

Print Name: _Linda Keag_

Title: _Practice Manager_

Date: _____3-30-12_____

## EXHIBIT A

## CONFIDENTIALITY AGREEMENT

PST Services, Inc. ("Per-Se") and Emergency Medicine Specialists of Orange County ("Client") have entered into an agreement whereby Per-Se provides certain services ("Services") to Client (the "Billing Agreement"). Client has entered into a contractual relationship with ____*[insert name of person/entity performing the audit]*___ ("Recipient") and instructs Per-Se to allow Recipient to review certain information in Per-Se's possession regarding Client's business and accounts receivable billing and collections performed by Per-Se ("Client Proprietary Information"). Therefore, in consideration of the mutual covenants and conditions contained in this Confidentiality Agreement (the "Confidentiality Agreement"), Recipient and Client agree as follows:

A.        During the course of Recipient's examination and review of Client Proprietary Information, Recipient may be exposed to or review certain proprietary information regarding Per-Se ("Per-Se Proprietary Information"). Per-Se Proprietary Information refers to any and all data and information relating to the business of Per-Se which has value to Per-Se and is not generally known by its competitors or the public, including, without limitation, financial information, inventions, methods, techniques, actual or potential customers and suppliers, the Billing Agreement, Per-Se's business practices or other trade secrets or confidential information of Per-Se, all report formats, and existing and future products and computer systems and software. Recipient acknowledges and agrees that all Per-Se Proprietary Information and all physical embodiments thereof are confidential to Per-Se and are and will remain the sole and exclusive property of Per-Se. All Per-Se Proprietary Information acquired by Recipient will be kept strictly confidential and will not be disclosed to any other person or entity (including any entity affiliated with or any division of Recipient).

B.        Per-Se Proprietary Information does not include information which (i) is publicly known or which becomes publicly known through no act or failure to act on the part of Recipient; (ii) is lawfully obtained by Recipient from any third party entitled to disclose such information; (iii) is in the lawful possession of Recipient prior to such information having been disclosed to Recipient by Per-Se; or (iv) is independently developed by Recipient.

C.        Recipient further agrees that during Recipient's engagement by Client and for a period of one (1) year following any termination of Recipient's engagement for whatever reason, Recipient will not, directly or indirectly, on Recipient's own behalf or in the service of, or on behalf of any other individual or entity, divert, solicit or hire away, or attempt to divert, solicit or hire away, to or for any individual or entity, any person employed by Per-Se, whether or not such employee is a full-time employee, temporary employee, leased employee or independent contractor of Per-Se, whether or not such employee is employed pursuant to written agreement and whether or not such employee is employed for a determined period or at-will.

D.        Recipient acknowledges that great loss and irreparable damage would be suffered by Per-Se if Recipient should breach or violate the terms of this Confidentiality Agreement. In the event Recipient breaches or violates this Confidentiality Agreement. Recipient agrees that Per-Se would not have an adequate remedy at law and, therefore, that Per-Se would be entitled to a temporary restraining order and permanent injunction to prevent a breach of any of the terms or provisions contained in this Confidentiality Agreement, in addition to any monetary damages that may be available at law or equity. Recipient's obligations under this Confidentiality Agreement will terminate one (1) year from the conclusion of Recipient's services on behalf of Client. .

E.        Recipient represents and warrants that (i) it has the full power and authority to enter into this Confidentiality Agreement, and (ii) the person executing this Confidentiality Agreement has the full power and authority to do so.

IN WITNESS WHEREOF, Recipient has signed this Confidentiality Agreement as of the date below written.

RECIPIENT: _____            **EMERGENCY MEDICINE SPECIALISTS OF**
                                              **ORANGE COUNTY**


By: _____          By: _____

Print Name: _____         Print Name: _Linda J Piero q_

Title: _____         Title: _Practice Manager_

Date: _____          Date: __3 - 30 - 12__

Exhibit "B"



**Amendment**

This Amendment ("Amendment") to the Reimbursement Management Services Agreement (RMS136419) ("Agreement") is between Change Healthcare Technology Enabled Services, LLC, successor-in-interest to PST Services, Inc. ("Service Provider") and Emergency Medicine Specialists of Orange County ("Client") This Amendment is effective as of the latest date in the signature block ("Amendment Effective Date").

WHEREAS, certain issues have arisen under the Agreement related to on operational delay in the working of appeals and correspondence which (i) created reimbursement and timely filing denials for Client (ii) occurred during the time period of January 2019 through December 2019 and (iii) created a shortfall in collections for Client (the "Untimely Filing Issue") which the parties desire to resolve without admitting liability; and

The parties agree to the following terms.

**Terms**

1. <u>Name Change</u>. The parties acknowledge and agree that: (i) Change Healthcare Technology Enabled Services, LLC assumed all rights and responsibilities of PST Services, Inc. under the CA, and (ii) all references to PST Services, Inc. or "Per-Se" in the Agreement or any amendment or addendum or exhibit or schedule to the Agreement shall be deemed to have been changed to Change Healthcare Technology Enabled Services, LLC ("Service Provider").

2. <u>Section 2. Term</u>. The term of the Agreement is extended for period of two (2) years from July 1, 2020 ("the Renewal Term"). Thereafter, the Agreement will automatically renew for additional one (1) year terms ("Renewal Term") unless (i) either party provides to the other party, at least ninety (90) days prior to the expiration of the then-current term, written notice of its intent to terminate the Agreement or (ii) as otherwise set forth in Section 11 of this Agreement.

3. <u>Section 11. Termination</u>. As of July 1, 2020, sub-Section 11.6 is deleted in its entirety and replaced with the following:

   11.6 After the 1st Renewal Term, beginning on July 1, 2020 and ending on June 30, 2022, either party may terminate this Agreement at any time and for any reason or no reason on one hundred twenty (120) days' prior written notice to the other party.

4. <u>Service Credit</u>. Service Provider agrees to credit Client an amount equal to <u>$73,844.00</u> (the "Untimely Filing Credit"). The amount shall be credited to Client over twelve consecutive payments beginning with the invoice sent to Client for July 2020. The invoices shall be in the amount of $6,153.67. Client acknowledges and agrees that the Untimely Filing Credit will make Client whole for the Untimely Filing Issue for the specified time period.

5. Each party releases and forever discharges the other party, its affiliates, officers, directors, agents, successors, and assigns from any claims, actions, causes of action, demands, suits, or damages of any type related to the subject matter of this Amendment resulting from events occurring on or before the Amendment Effective Date.

6. Capitalized terms not defined in this Amendment are defined in the Agreement. All terms in the Agreement not modified by this Amendment are still in force. This Amendment contains all the terms agreed upon by the parties regarding the subject matter of this Amendment and supersedes any other communications relating to the subject matter of this Amendment.

Emergency Medicine Specialists of Orange County
Amendment No: P202110038328
July 10, 2020

**Change Healthcare Technology Enabled Services, LLC**

By: _____

Name: _____

Title: _____

Date: _____

**Emergency Medicine Specialists of Orange County**

By: _____

Name: _____ Matthew Mullarky, M.D. Inc.

Title: _____ Managing Partner

Date: _____ 7/13/20.